UNITED STATES of America,
Appellee,

v.

Antonio OLMEDA, Defendant–
Appellant.

Docket No. 05–4331–CR.

United States Court of Appeals,
Second Circuit.

Argued: April 3, 2006.

Decided: Aug. 29, 2006.

---

Michael H. Sporn, New York, NY, for Defendant–Appellant.

Brendan R. McGuire, Assistant United States Attorney (John M. Hillebrecht, Assistant United States Attorney, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Before CABRANES, SOTOMAYOR, and RAGGI, Circuit Judges.

REENA RAGGI, Circuit Judge.

Defendant Antonio Olmeda appeals from an order of the United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge)* denying his pre-trial motion to dismiss a one-count indictment charging him with unlawful possession of ammunition in Manhattan in June 2002 in violation of 18 U.S.C. § 922(g) ("Southern District indictment"). Olmeda contends that the Southern District indictment is barred by the Double Jeopardy Clause, *see* U.S. Const., amend. V, because the conduct alleged therein was subsumed within an earlier indictment charging him with ammunition possession in June 2002 "within the Eastern District of North Carolina and elsewhere" ("North Carolina indictment"), to which he had already pleaded guilty. We conclude that Olmeda's contemporaneous possessions of ammunition in the Eastern District of North Carolina and the Southern District of New York could have supported separate indictments in each district without violating double jeopardy. Nevertheless, because the law would not have precluded Olmeda's guilty plea to a single duplicitous count in one district covering both his June 2002 ammunition possessions, we must closely examine the scope of the North Carolina indictment to decide whether it bars the pending Southern District prosecution. On the particular record presented to us in this case, we conclude (1) that Olmeda has satisfied his initial burden to make a colorable objective showing that the "and elsewhere" language of the North Carolina indictment references his New York ammunition possession because, at the time prosecutors presented that indictment, they (a) knew that Olmeda had contemporaneously possessed ammunition in New York and North Carolina, (b) had no reason to think that Olmeda possessed ammunition anywhere other than in North Carolina and New York, and (c) lacked any good faith basis to think that Olmeda had ever possessed the ammunition seized in North Carolina anywhere other than in the charging district. Further, we conclude (2) that the government has failed to carry its resulting burden to demonstrate by a preponderance of the evidence that a reasonable observer would construe the North Carolina indictment, at the time jeopardy attached, *not* to reference both the New York and North Carolina June 2002 ammunition possessions. Accordingly, in light of Olmeda's guilty plea to the North Carolina indictment, we hold that the Southern District indictment charging him with the June 2002 New York ammunition

possession is barred by double jeopardy. We reverse the contrary ruling of the district court and remand the case with directions to dismiss the Southern District indictment.

## I. *Factual Background*

### A. *The June 2002 Ammunition Seizures in North Carolina and New York*

On June 13, 2002, agents of the Federal Bureau of Investigation ("FBI") arrested Antonio Olmeda, a convicted felon,[1] at a bus station in Fayetteville, North Carolina, in possession of a bag containing 200 rounds of ammunition for a .38 caliber rifle, 60 rounds of ammunition for a .308 caliber rifle, and 68 rounds of ammunition for a .45 caliber handgun.[2] Having reason to believe that Olmeda resided in the New York City area, the North Carolina FBI agents contacted their New York counterparts who, on June 19, 2002, executed a search warrant at Olmeda's Manhattan apartment and seized from the bedroom 88 rounds of ammunition for several different types of firearms.[3] Because Olmeda had been in custody in North Carolina from June 13 through June 19, 2002,[4] it was reasonable to infer that the ammunition seized from the Manhattan apartment had been at that site throughout that time.

### B. *The North Carolina Indictment and Guilty Plea*

Approximately one month later, on July 16, 2002, a federal grand jury in the Eastern District of North Carolina charged Olmeda in a one-count indictment with unlawful possession of an unspecified quantity of ammunition in that district "and elsewhere." Specifically, the North Carolina indictment stated:

> On or about June 13, 2002, within the Eastern District of North Carolina and elsewhere, the defendant, ANTONIO OLMEDA, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, did possess in and affecting commerce ammunition which had been shipped and transported in interstate and foreign commerce;
>
> All in violation of the provisions of Title 18, United States Code, Section 922(g).

North Carolina Indictment at 1.

On December 3, 2002, Olmeda pleaded guilty, without any plea agreement, to the North Carolina charge. He did not personally allocute to any particular conduct supporting his plea. Rather, after Olmeda generally acknowledged his guilt, the prosecution noted that, if the case were to proceed to trial, it would prove that, on June 13, 2002, when Olmeda was stopped and questioned by federal agents at a Fayetteville bus station, he admitted that the bag he was carrying contained ammunition, a fact confirmed by a subsequent search of the bag and seizure of the ammunition. The prosecution made no mention of the ammunition seized from Olmeda's New York apartment on June 19, 2002.

---

1. Olmeda was convicted in 1995 in New York State for criminal possession of a weapon in the first degree, a class B felony.

2. At the time of his arrest, Olmeda also had in his possession a sniper instruction manual and equipment commonly used by snipers to conceal themselves.

3. Agents also seized from Olmeda's apartment a cheek rest for an AR–15 rifle, numerous sniper and firearms instructional videotapes, and instruction manuals for various firearms, including manuals entitled: "Army and Navy Technical Manual for Grenades," "How to Create a New Identity," "The Gun Digest Book of Assault Weapons," and "Department of the Army Silencers Principles and Evaluations."

4. In fact, it appears that Olmeda was detained through sentencing.

Nor was the New York seizure referenced at Olmeda's April 17, 2003 sentencing. Instead, the government emphasized the seriousness of Olmeda's prior New York felony conviction—which apparently involved possession of a flame thrower, 18 pipe bombs, black powder, 11 rounds of ammunition, a machine gun, and a sawed-off shotgun [5]—and his suspicious inquiries in North Carolina about security procedures at Fort Bragg, in urging the court to impose a sentence at the high end of Olmeda's Sentencing Guidelines range. In seeking leniency, Olmeda attempted to portray himself simply as "an avid gun-smith and sportsman," interested in legitimately collecting and distributing army surplus materials. Sentencing Tr. 4. Acknowledging that he had made similar ammunition purchases "a couple other times," Olmeda nevertheless insisted that he never intended to harm persons or property with the weaponry he acquired. *Id.* at 4, 18.

With little discussion, the district court sentenced Olmeda to eighteen months' imprisonment, the high end of his Sentencing Guidelines range, and three years' supervised release.[6] Given credit for time already spent in pre-sentence custody, Olmeda completed serving his prison term in early October 2003.

### C. *The Southern District Indictment and Olmeda's Motion to Dismiss*

Some ten months after Olmeda's release from prison, on August 10, 2004, a federal grand jury sitting in the Southern District of New York returned a one-count indictment charging him with unlawful possession of the ammunition seized from his Manhattan apartment on June 19, 2002. That indictment stated:

On or about June 19, 2002, in the Southern District of New York, ANTONIO OLMEDA, the defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, to wit, a November 2, 1995 conviction for criminal possession of a weapon in the first degree, a Class B felony, in the New York State Supreme Court, Bronx County, unlawfully, willfully, and knowingly did possess in and affecting commerce, ammunition, to wit, approximately 88 rounds of various types of ammunition, that were produced with cartridge cases that had previously been shipped and transported in interstate commerce.

(Title 18, United States Code, Section 922(g)(1).)

Southern District Indictment at 1.

On February 17, 2005, Olmeda moved for the dismissal of this indictment, argu-

---

**5.** As these facts, as well as those relating to the June 2002 seizures, make plain, Olmeda's persistent unlawful possession of weaponry presented real and serious public safety concerns. It is not our task on this appeal, however, to express a view as to how Olmeda should have been prosecuted or sentenced for his criminal conduct. Our inquiry is narrower, limited to deciding whether, on the record presented, Olmeda's North Carolina prosecution stands as a double jeopardy bar to the pending New York indictment.

**6.** Olmeda's base offense level was determined by reference to U.S.S.G. § 2K2.1(a)(6) (providing base offense level of 14 for possession offense after prior felony conviction). Be-

cause the quantity of ammunition possessed makes no difference in the Guidelines calculation, *cf.* U.S.S.G. § 2K2.1(b)(1) (providing for increases in offense level depending on number of *firearms* possessed), Olmeda's Guidelines sentencing range would have been the same whether or not the New York ammunition possession was part of the North Carolina crime of conviction. Further, because Olmeda was sentenced before the Supreme Court decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the district court understandably did not treat the Guidelines as advisory or consider its discretion to impose a non-Guidelines sentence.

ing that (1) double jeopardy precluded the government from prosecuting him in the Southern District of New York for conduct that was subsumed in the earlier North Carolina indictment, and (2) the two-year delay between the New York seizure of ammunition and the Southern District indictment deprived him of due process. *See* U.S. Const., amend V. After conducting a hearing on the issue of undue delay, the district court rejected both of Olmeda's constitutional claims as without merit. With particular reference to the double jeopardy challenge, the district court noted the " 'general rule ... that one offense is charged under the terms of [the unlawful possession statute] regardless of the number of firearms involved, absent a showing that the firearms were stored or acquired at different times and places.'" *United States v. Olmeda,* No. 04 CR 858, 2005 WL 1241899, at *3 (S.D.N.Y. May 24, 2005) (quoting *United States v. Wiga,* 662 F.2d 1325, 1336 (9th Cir.1981) (internal quotation marks omitted)). Applying this rule, the district court held that double jeopardy did not bar Olmeda's prosecution on the Southern District indictment because "it seems clear that the ammunition referred to in [that indictment] must have been acquired at least on [a] different date[ ]" than the ammunition seized from Olmeda's person in North Carolina. *Id.* at *4.

Olmeda filed an interlocutory appeal of the district court's ruling to this court.

## II. *Discussion*

### A. *Jurisdiction and the Standard of Review*

■ In general, we lack jurisdiction to review rulings made in criminal cases until a final judgment has been entered. See 28 U.S.C. § 1291; *United States v. MacDonald,* 435 U.S. 850, 853, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978). The "collateral order doctrine" creates an exception to this rule for orders that "(1) 'conclusively

determine the disputed question,' (2) 'resolve an important issue completely separate from the merits of the action,' and (3) [will] be 'effectively unreviewable on appeal from a final judgment.'" *Cruz v. Ridge,* 383 F.3d 62, 64 (2d Cir.2004) (quoting *Whiting v. Lacara,* 187 F.3d 317, 320 (2d Cir.1999)); *see also Bernard v. County of Suffolk,* 356 F.3d 495, 501–02 (2d Cir. 2004). Denials of motions to dismiss on double jeopardy grounds qualify as appealable orders within the collateral order doctrine. *See Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). As the Supreme Court explained in *Abney,* "if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs." *Id.* (emphasis omitted). Accordingly, we conclude that we have jurisdiction to hear this interlocutory appeal. Further, because Olmeda's motion to dismiss the Southern District indictment on double jeopardy grounds raises a question of law, or, at most, a mixed question of law and fact, we review the denial of that motion *de novo.* See *United States v. Estrada,* 320 F.3d 173, 180 (2d Cir.2003) (providing for *de novo* review of double jeopardy issue); *United States v. Leyland,* 277 F.3d 628, 631 (2d Cir.2002); *see also Davis v. New York City Housing Auth.,* 278 F.3d 64, 79 (2d Cir.2002) (holding mixed questions of law and fact subject to *de novo* review).

### B. *The Double Jeopardy Clause*

■ The Fifth Amendment to the United States Constitution provides that never "shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. " 'Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor pun-

ished a second time for the same offense.'" *United States v. Estrada,* 320 F.3d at 180 (quoting *Sattazahn v. Pennsylvania,* 537 U.S. 101, 106, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003)). In essence, the Double Jeopardy Clause protects criminal defendants against three things: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). This case implicates the latter two considerations.

██ Double jeopardy clearly "prohibits a second prosecution for the same offense following a guilty plea." *Morris v. Reynolds,* 264 F.3d 38, 49 (2d Cir.2001); *see United States v. Aliotta,* 199 F.3d 78, 83 (2d Cir.1999) (observing that, "[a]s a general rule, jeopardy attaches in a criminal case at the time the district court accepts the defendant's guilty plea").[7] Accordingly, the government does not dispute that, upon Olmeda's guilty plea to the North Carolina indictment, double jeopardy precluded his further federal prosecution for the ammunition possession crime charged therein. Nevertheless, it argues that the district court correctly rejected Olmeda's double jeopardy challenge to the Southern District indictment because that indictment charges Olmeda with a different and distinct ammunition possession crime. Such a conclusion is by no means obvious on the record in this case.

C. *The Permissibility of Separate § 922(g) Charges for Ammunition Possessions in North Carolina and in New York*

The government has charged Olmeda in separate indictments with two violations of 18 U.S.C. § 922(g) for possessing distinct caches of ammunition in North Carolina and New York, even though it concedes that Olmeda simultaneously possessed (or constructively possessed) both caches on or about the same date, June 13, 2002. Because Olmeda submits that his June 2002 ammunition possessions evidence only a single offense, we first consider whether the conduct at issue could, in fact, support separate charges for violations of the same law. We conclude that it could.

Title 18 U.S.C. § 922(g) states in relevant part:

> It shall be unlawful for any person ... who has been convicted in any court of[ ] a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

As some of our sister circuits have observed, the statutory reference to "*any* firearm or ammunition," *id.* (emphasis added), "creates '[u]ncertainty as to the unit of prosecution intended by Congress,'" *United States v. Buchmeier,* 255 F.3d 415, 421 (7th Cir.2001) (alteration in original) (quoting *United States v. Cunningham,* 145 F.3d 1385, 1398 (D.C.Cir. 1998)). This ambiguity is of particular concern when a defendant simultaneously possesses multiple firearms and/or multiple rounds of ammunition. *See United States v. Dunford,* 148 F.3d 385, 389–90 (4th Cir.1998) (discussing ambiguity of statute).

██ Generally, the rule of lenity dictates that only one offense per transaction may be charged in criminal cases. *See*

---

7. In certain circumstances, jeopardy is not deemed to attach at the time of a guilty plea, for example, where a defendant subsequently withdraws his plea. *See, e.g., United States v. Podde,* 105 F.3d 813, 816–17 (2d Cir.1997). That, however, is not this case.

*Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (stating that "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses"). Applying this rule in *United States v. Pelusio,* a case involving a predecessor statute to § 922(g) that prohibited a convicted felon from receiving "any firearm or ammunition" that had traveled in interstate commerce,[8] this court held that the receipt of multiple firearms and/or multiple rounds of ammunition by such a felon should usually be charged only as a single offense, 725 F.2d 161, 168 (2d Cir. 1983). At the same time, however, the court implicitly recognized that a convicted felon's receipt of such items may properly be prosecuted as multiple violations of the same statute if the evidence showed the felon received certain of the items on separate occasions. *See id.* (holding that, "absent any evidence that the defendants received the .12 gauge shotgun and the five rounds of ammunition on separate occasions, they could not lawfully be found guilty of receipt of the gun and the ammunition as separate crimes forming the subject of multiplicitous counts").

■ *Pelusio's* reasoning as to the *receipt* of multiple firearms and ammunition applies with equal force to the proscribed *possession* of such items in 18 U.S.C. § 922(g). Thus, we here hold that, although a convicted felon who simultaneously possesses various firearms and rounds of ammunition can generally only be charged with a single violation of § 922(g), multiple charges may well be warranted if the evidence shows that the felon acquired possession of the firearms or ammunition on different occasions, or that he stored them at different sites. As courts that have reached the same conclusion with respect to § 922(g) or its predecessor statute have sensibly observed, " '[a]ny other determination would allow convicted felons and terrorists to establish armories where all of their weapons would be kept. The person in custody of the armory would then be subject to only a single charge of possession, although thousands of illegal and dangerous weapons were received and stockpiled at different times.' " *United States v. Wiga,* 662 F.2d at 1337 [9th Cir.] (quoting *United States v. Bullock,* 615 F.2d 1082, 1086 (5th Cir. 1980)); *see also United States v. Buchmeier,* 255 F.3d at 423 [7th Cir.]; *United States v. Cunningham,* 145 F.3d at 1398–99 [D.C.Cir.]; *United States v. Dunford,* 148 F.3d at 388–90 [4th Cir.]; *United States v. Keen,* 104 F.3d 1111, 1118 n. 11 (9th Cir.1996); *United States v. Hutching,* 75 F.3d 1453, 1460 (10th Cir.1996); *United States v. Bonavia,* 927 F.2d 565, 568–69 (11th Cir.1991); *United States v. Frankenberry,* 696 F.2d 239, 244–45 (3d Cir.1982); *United States v. Rosenbarger,* 536 F.2d 715, 720–21 (6th Cir.1976).

■ Because Olmeda plainly possessed multiple rounds of ammunition at two different locations, one in the Southern District of New York, the other in the Eastern District of North Carolina, we conclude that his conduct supported prosecution in each district for a separate possession violation under § 922(g), notwithstanding any temporal overlap in these possessions. Indeed, this conclusion is reinforced by record facts, correctly noted by the district court, indicating the high

**8.** Title 18 U.S.C. § 922(h)(1), as then in force, stated: " 'It shall be unlawful for any person ... who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.' " *United States v. Pelusio,* 725 F.2d at 164 n. 1 (quoting statute).

probability that Olmeda acquired the ammunition seized from his person in North Carolina on a different (and later) date than the ammunition seized from his apartment in New York. *See United States v. Olmeda*, 2005 WL 1241899, at *4.

In sum, the fact that Olmeda was separately charged in two districts for ammunition possessions in June 2002 does not, by itself, indicate a double jeopardy violation. Rather, we must consider the scope of the charges at issue to determine whether the possession alleged in the Southern District of New York was, in fact, subsumed within the earlier North Carolina indictment.

D. *The Permissibility of a Duplicitous Indictment Charging Both of Olmeda's June 2002 Ammunition Possessions in a Single Count*

 In light of our conclusion that Olmeda's North Carolina and New York ammunition possessions are separately chargeable, an indictment that pleaded both possessions in a single § 922(g) count could reasonably be viewed as "duplicitous." *See United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992) (defining indictment as duplicitous "if it joins two or more distinct crimes in a single count"). Duplicitous pleading, however, is not presumptively invalid. *See United States v. Sturdivant*, 244 F.3d 71, 75 n. 3 (2d Cir. 2001) (noting that duplicitous charging is "impermissible" only if it prejudices defendant); *United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir.1981) (observing that duplicity objection is properly invoked only when challenged indictment affects doctrine's underlying policy concerns: (1) avoiding uncertainty of general guilty verdict by concealing finding of guilty as to one crime and not guilty as to other, (2) avoiding risk that jurors may not have been unanimous as to any one of the crimes charged, (3) assuring defendant adequate notice of charged crimes, (4) providing basis for appropriate sentencing, and (5) providing adequate protection against double jeopardy in subsequent prosecution). To the contrary, this court has long held that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989); *see also United States v. Aracri*, 968 F.2d at 1518; *United States v. Margiotta*, 646 F.2d at 733 (approving inclusion of multiple fraudulent mailings in single mail fraud charge). In such circumstances, duplicity may actually inure to a defendant's benefit by "limiting the maximum penalties" he might face if he were charged and convicted on separate counts for what amounts to a single scheme. *See United States v. Margiotta*, 646 F.2d at 733. Further, it would avoid the defendant's portrayal to the jury "as the perpetrator of [multiple] crimes." *Id.* Although the latter benefit is not relevant in this case because Olmeda did not stand trial, the former benefit might nevertheless prompt a defendant pleading guilty not to object to a duplicitous pleading. In any event, a court will not subsequently entertain his complaints of duplicity. *See United States v. Moloney*, 287 F.3d 236, 239 (2d Cir.2002) ("A guilty plea waives any challenges to a duplicitous indictment.").

Not insignificantly, the government does not here contend that it would have been impermissible to charge Olmeda in a single-count indictment with both of his June 2002 ammunition possessions.[9] It argues only that the North Carolina indictment should not be so construed in assessing Olmeda's double jeopardy claim. To re-

---

**9.** Thus, we have no occasion to decide on the slim record in this case whether the posses-sions were, in fact, reasonably viewed as part of a larger common scheme.

solve this construction issue, it is useful to consider the assigned burdens of proof applicable to double jeopardy claims.

### E. The Shifting Burden of Proof on a Double Jeopardy Claim

"A double jeopardy claim cannot succeed unless the charged offenses are the same in fact and in law." *United States v. Estrada,* 320 F.3d at 180. In this case, there is no question that the offenses at issue in the Southern District and North Carolina indictments are the same "in law" as both allege possession violations of the same criminal statute, 18 U.S.C. § 922(g). *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (providing for legal identity of charges to be determined by reference to their respective elements); *accord United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (observing that *Blockburger* test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution"). The only controverted issue is whether the charged offenses are the same "in fact."

■■■ To determine whether two offenses charged in successive prosecutions are the same in fact, a court must ascertain whether a reasonable person familiar with the totality of the facts and circumstances would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense that is charged in the subsequent prosecution. Thus, where a defendant pleads guilty to an initial indictment, it is not enough for him to assert that he subjectively believed that his allocution covered conduct charged in a subsequent prosecution. A court must further determine that such a conclusion would be reached by an objective arbiter. That determination will require examination of the plain language of the indictments in the two prosecutions, as well as "the entire record of the proceedings." 1 Charles Alan Wright, *Federal Practice and Procedure* § 125 (3d ed.1999); *see United States v. Walsh,* 194 F.3d 37, 45 (2d Cir.1999) (reviewing challenged indictment in context). In certain cases, it may be relatively simple to determine objectively the factual identity of different charges. *See, e.g., United States v. Asher,* 96 F.3d 270, 273 (7th Cir.1996) ("[I]t is simple enough to determine if a defendant is being prosecuted twice for the same murder or for two different murders."). But where the parameters of a charged crime are unclear, as in the case of an ambiguously worded indictment, the inquiry can be more complicated. In such circumstances, it is important to identify the proper assignment of the burden of proof.

■■■ In considering double jeopardy challenges to successive conspiracy prosecutions, this court has identified a shifting burden of proof. The initial burden falls on the defendant invoking double jeopardy to "make[ ] a non-frivolous showing that two indictments in fact charge only one conspiracy." *United States v. Lopez,* 356 F.3d 463, 467 (2d Cir.2004) (*per curiam* ). If the defendant successfully makes such a colorable objective showing, then "the burden shifts to the prosecution to show, by a preponderance of the evidence, that there are in fact two distinct conspiracies and that the defendant is not being placed in jeopardy twice for the same crime." *Id.; see United States v. DelVecchio,* 800 F.2d 21, 22 (2d Cir.1986); *United States v. Mallah,* 503 F.2d 971, 985–86 (2d Cir.1974). In part, this shifting burden analysis acknowledges the particular multiplicity concern underlying successive conspiracy charges: "the ease with which prosecutors can draft indictments that allege what ap-

pear to be separate conspiracies but may actually be parts of an overall conspiracy." *United States v. Abbamonte,* 759 F.2d 1065, 1068 (2d Cir.1985), *overruled on other grounds by, United States v. Macchia,* 41 F.3d 35, 38–39 (2d Cir.1994). At the same time, however, it reflects general recognition—by no means limited to conspiracy cases—that (1) a fact-intensive examination of the charged conduct is necessary whenever a double jeopardy challenge is raised to successive prosecutions for violations of the same law, *see United States v. Mallah,* 503 F.2d at 982–87; and (2) as between the government and the defendant, the government, being the party that drafts indictments, should bear any burden resulting from imprecise language, *see United States v. Inmon,* 568 F.2d 326, 332 (3d Cir.1977) ("[W]e also point to the obvious fact that it is the government which has control over the drafting of indictments. Any burden imposed by the imprecision in the description of separate offenses should be borne by it."). For these reasons, we here conclude that a shifting burden analysis appropriately applies to a double jeopardy challenge to successive prosecutions under the same law, whether the crimes at issue are substantive or conspiratorial. To reiterate that analysis, the defendant must first make a colorable objective showing that a reasonable person familiar with the totality of the facts and circumstances would construe the first indictment, at the time jeopardy attached, to cover the offense that was charged in the subsequent prosecution. If the defendant makes that showing, the burden shifts to the government to demonstrate, by a preponderance of the evidence, that a reasonable person familiar with the totality of the facts and circumstances would *not,* in fact, construe the initial indictment, at the time jeopardy attached, to cover the offense that was charged in the subsequent prosecution.

F. *The Government's Failure to Meet Its Ultimate Burden of Proving that the New York Ammunition Possession Is Not Subsumed in the North Carolina Indictment*

1. *Olmeda's Colorable Showing that the North Carolina Indictment Included His Possession of Ammunition in New York*

■ Four facts allow Olmeda to make a colorable objective showing that the North Carolina indictment referenced both his North Carolina and New York ammunition possessions in June 2002. First, the plain language of the North Carolina indictment references ammunition possession outside the charging district; it charges Olmeda with ammunition possession "[o]n or about June 13, 2002, within the Eastern District of North Carolina *and elsewhere.*" North Carolina Indictment at 1 (emphasis added). Second, at the time of the North Carolina presentment, prosecuting authorities knew that Olmeda had simultaneously possessed ammunition in the Eastern District of North Carolina and the Southern District of New York. Third, nothing in the record indicates that prosecuting authorities had any reason to think that Olmeda possessed ammunition anywhere other than in North Carolina and New York. Fourth, nothing in the record indicates that prosecuting authorities had a good faith basis for thinking that any part of Olmeda's North Carolina ammunition possession occurred outside the charging district. In light of the foregoing, we conclude that Olmeda has carried his initial burden.

In arguing to the contrary, the government submits that Olmeda cannot make a colorable objective showing of the identity in fact of the two prosecutions because the "and elsewhere" language in the North Carolina indictment "was mere surplusage and could not possibly have been under-

stood as anything more." Appellee's Br. at 25.[10] We recognize the frequency with which expansive language such as "and elsewhere" or "and others" is used in indictments to provide prosecutors with flexibility in proving their cases. *See, e.g., United States v. Lopez,* 356 F.3d at 466. We do not, however, assume from the fact that certain expansive pleading language is routine that it equates to "mere surplusage." Rather, we assume that, in general, when such language is included in an indictment, it is supported by a reasonable good faith belief that places or persons other than those specifically alleged are involved in the charged conduct, even if the particulars of those places or persons are not yet known. *See generally* Fed. R.Crim.P. 7(c)(1) ("A count may allege that the means by which the defendant commit-

ted the offense are unknown or that the defendant committed it by one or more specified means.").

In this case, the record indicates that, at the time of Olmeda's July 16, 2002 indictment in the Eastern District of North Carolina (and at all times since), prosecuting authorities had no good faith basis for thinking that he had ever possessed the ammunition seized from him in Fayetteville on June 13, 2002, in any place other than the Eastern District of North Carolina, so as to warrant referencing "and elsewhere" with respect to that particular possession.[11] Equally significant for purposes of our double jeopardy review, at the time of Olmeda's North Carolina indictment, prosecuting authorities knew that "[o]n or about June 13, 2002," the defendant had constructively possessed another cache of ammunition in his New York apartment.[12] But they had no reason

---

**10.** Before the district court, the government framed its argument somewhat differently, asserting that inclusion of the "and elsewhere" language in the North Carolina indictment was "obviously erroneous." Gov't Mem. in Opp. to Motion to Dismiss at 7. If this were so, to defeat a subsequent double jeopardy challenge, the government was obliged to correct the error before the defendant pleaded guilty. *See Morris v. Reynolds,* 264 F.3d at 50 (noting that district court generally has power to correct pleading errors to avoid double jeopardy problems, but once defendant has pleaded guilty, correction of those pleading errors infringes his "rights under the Double Jeopardy Clause to finality and repose, [and] the power to correct mistakes must cede ground").

**11.** The record indicates that Olmeda traveled from New York to North Carolina for the specific purpose of acquiring ammunition in that state and that he purchased the ammunition seized from his possession in Fayetteville at a pawn shop in that city.

**12.** We note that we do not view various law enforcement divisions within the federal government as monolithic when, on review of a double jeopardy challenge, we consider prosecutors' knowledge of a defendant's criminal activity at the time of an initial indictment. *Cf. United States v. Avellino,* 136 F.3d 249,

255 (2d Cir.1998) (holding, in context of alleged *Brady* violation, that "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor"). In this case, however, because prosecutors and agents in North Carolina and New York appear to have been working together in arranging for the search of Olmeda's Manhattan apartment, we can reasonably infer that North Carolina prosecutors specifically knew about Olmeda's New York ammunition possession at the time they sought his indictment "within the Eastern District of North Carolina and elsewhere." Certainly, the government does not contend otherwise.

Further, nothing in the record indicates that prosecuting authorities hid the Manhattan ammunition seizure from Olmeda. Nor would such an inference be warranted. *See generally* Fed.R.Crim.P. 41(f)(3) ("The officer executing the warrant must: (A) give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken; or (B) leave a copy of the warrant and receipt at the place where the officer took the property."); *see also* Fed.R.Crim.P. 16(a)(1)(E)(iii) (providing for defendant's inspection, upon request, of any object obtained from or belonging to him).

to think that he had possessed ammunition anywhere other than in North Carolina or New York. Thus, when Olmeda was charged in the Eastern District of North Carolina with the possession of ammunition in that district "and elsewhere," prosecutors specifically knew that New York was "where else" the defendant had engaged in such unlawful possession.[13]

We emphasize that, had the prosecutors lacked such specific knowledge, Olmeda might not have been able to carry his initial burden. A reasonable person would be unlikely to conclude that the initial indictment's reference to "elsewhere" covered conduct of which the prosecutors then had no reason to be aware. *See generally Brown v. Ohio,* 432 U.S. 161, 169 n. 7, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (observing that double jeopardy may not be not implicated where facts relevant to succeeding charge "have not occurred or have not been discovered despite the exercise of due diligence" at time jeopardy attached); *Jeffers v. United States,* 432 U.S. 137, 152, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) (reaching same conclusion when government, in exercise of due diligence, could not discover facts underlying greater offense prior to initial trial); *see also* Model Penal Code § 1.07(2) (observing· that "defendant shall not be subject to separate trials for multiple offenses based on the same conduct or arising from the same criminal episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction of a single court"). Put differently, we would be less willing to construe an indictment as a bar to future prosecutions where the government was not aware, and had no reason to be aware, that the defendant had committed additional crimes that were arguably covered by expansive language in the indictment. *See generally Ohio v. Johnson,* 467 U.S. 493, 502, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984) (cautioning that defendants "should not be entitled to use the Double Jeopardy Clause as a sword"). But in light of North Carolina authorities' knowledge of Olmeda's contemporaneous New York ammunition possession, coupled with their lack of knowledge that Olmeda possessed ammunition anywhere other than in North Carolina or New York, and in the absence of any good faith basis for them to allege that Olmeda's Fayetteville ammunition possession occurred "elsewhere" than in the Eastern District of North Carolina, we conclude that the burden appropriately shifts to the government to demonstrate that Olmeda's New York ammunition possession is not, in fact, subsumed within the North Carolina indictment.

2. *The Government's Unconvincing Reliance on the North Carolina Plea and Sentencing Proceedings in Response to Olmeda's Double Jeopardy Challenge*

 Notwithstanding Olmeda's colorable objective showing that the expansive language of the North Carolina indictment

---

**13.** To the extent the government challenges such a reading of the North Carolina indictment by arguing that venue to prosecute Olmeda's New York ammunition possession was lacking in the Eastern District of North Carolina, we note that improper venue, like duplicitous pleading, is an objection waived by a defendant who fails to raise it before pleading guilty. *See United States v. Bala,* 236 F.3d 87, 95 (2d Cir.2000) (holding that objections to venue are waived unless specifically raised); 2 Charles Alan Wright, *Federal Practice and Procedure* § 306 (3d ed.1999) (noting "proposition that venue is a privilege provided for the benefit of the accused, rather than a limitation on the jurisdiction of the court, and [as such] may be waived by the defendant" (footnote omitted)). Accordingly, we accord venue little weight in considering whether the North Carolina indictment is fairly construed to include Olmeda's New York ammunition possession within its single § 922(g) charge.

includes his June 2002 New York ammunition possession, the government submits that this conclusion is refuted by the record of plea and sentencing proceedings in North Carolina. Specifically, it argues that, because "[t]he record of the North Carolina prosecution is totally devoid of any mention of the 88 rounds of ammunition found in Olmeda's New York apartment, while replete with references to the 328 rounds of ammunition seized in North Carolina," the North Carolina indictment cannot "fairly be read as embracing ammunition seized in New York on June 19." Appellee's Br. at 20. Certainly this argument is not frivolous and merits serious attention. In the end, however, we conclude that the government has failed to show by a preponderance of the evidence that a reasonable person familiar with the totality of the facts and circumstances would construe the indictment in the first prosecution, at the time jeopardy attached, *not* to cover the offense charged in the second prosecution.

The government submits that, because Olmeda points to no instance where the government, in pre-trial discovery, plea negotiations, correspondence, or court statements in the North Carolina case, made reference to the ammunition seized from his Manhattan apartment, "the correct inference ... is that nothing of the sort ever happened."[14] Appellee's Br. at 21. But because Olmeda has carried his initial burden on his double jeopardy claim and because the referenced evidence of pre-trial proceedings is presumably equally available to the government, we decline to draw such an inference from evidence that is not, in fact, part of the record. On the relatively sparse factual record before

us, which fails to document the discovery afforded to the defense or any plea agreement memorializing the parties' understanding as to the conduct to which Olmeda would admit culpability, we conclude that the government has not carried its burden.

To the extent we have a record of Olmeda's plea proceeding, it reveals only his general admission of guilt to the charged crime, without any explication by the court or acknowledgment by Olmeda of the scope of the conduct at issue.

THE COURT: How do you then plead to the charge of felon in possession of ammunition; guilty or not guilty?

THE DEFENDANT: The plea will be guilty.

THE COURT: Are you guilty of it?

THE DEFENDANT: Yes, sir.

Plea Tr. 9.

Earlier in the proceeding, the district court had mistakenly observed that Olmeda was charged with unlawful possession of a firearm. Olmeda's counsel corrected this error, noting that the "indictment states ammunition he was caught with; ammunition, and not a firearm." *Id.* at 8. The government submits that this quoted language proves the defense's understanding that the North Carolina indictment charged only Olmeda's Fayetteville ammunition possession because "in no fashion was [Olmeda] 'caught with' the New York ammunition." Appellee's Br. at 22. We are not persuaded. First, as is apparent from the record, defense counsel's primary concern was in correcting the court's misimpression as to the item his client was charged with unlawfully possessing, *i.e.*, ammunition rather than a gun; counsel was not particularizing the site of the

14. Although our inquiry is an objective one, our hypothetical objective arbiter would factor into his reading of the indictment the totality of the facts and circumstances. This would include any evidence in the record reflecting an understanding between the parties as to the scope of the North Carolina charge to which Olmeda agreed to plead guilty. .

charged possession, much less acknowledging that his client's plea was limited to the North Carolina seizure with the possibility of future prosecution for the New York seizure. Second, while "caught with" most obviously references a miscreant's personal possession (especially when coupled with "redhanded"), we cannot agree with the government that the phrase could never be used or understood to reference a defendant's constructive possession. A person can, after all, be "caught with" contraband in his residence without necessarily being on the premises at the precise time of the seizure. Thus, neither the defendant's admission of guilt nor his counsel's statement at the plea allocution is evidence that would permit a reasonable person, familiar with the facts that allowed Olmeda to carry his initial burden, to conclude that the New York ammunition possession was not subsumed within the broad language of the North Carolina indictment.

The government submits that certain prosecution statements at the plea allocution provide such evidence. At the plea allocution, the prosecution, in summarizing its intended proof at trial, referenced only facts concerning Olmeda's June 13, 2002 Fayetteville arrest, making no mention of his contemporaneous New York ammunition possession. By itself, this demonstrates only that the North Carolina indictment *focused* on ammunition possession in that state. It is not enough to demonstrate by a preponderance that a reasonable person would conclude that, at the time of the guilty plea, the defendant's

only other known possession of ammunition in June 2002, that in New York, was not also included within the indictment's reference to "elsewhere." Certainly, nothing in the record suggests that Olmeda understood the government's brief proffer to reflect such a narrow construction by the prosecuting authorities of the scope of the indictment. Indeed, he did not comment at all on the proffer, even to the extent of acknowledging its correctness with respect to the North Carolina seizure.

■ Furthermore, it is hardly clear that the proffer was meant to be a comprehensive account of the prosecutor's understanding of the charged conduct. While government proffers can be useful in establishing the factual basis for a guilty plea, *see* Fed.R.Crim.P. 11(b)(3), nothing requires such proffers to specify all the conduct that the government might prove at trial to establish the charged crime, *see United States v. Smith*, 160 F.3d 117, 121 (2d Cir.1998) (noting that court's obligation to determine existence of adequate factual basis for guilty plea " 'does not require the judge [at a plea allocution] to replicate the trial' " that the parties hoped to avoid with a guilty plea (quoting *United States v. Lumpkins*, 845 F.2d 1444, 1451 (7th Cir.1988))). Under the totality of the circumstances presented, we conclude that neither the defendant's allocution nor the government's plea proffer would lead a reasonable person to read the North Carolina indictment's "and elsewhere" language *not* to include Olmeda's Manhattan ammunition possession.[15]

---

**15.** To the extent the government suggests that the lack of any mention of the Manhattan ammunition seizure during the North Carolina plea proceedings implicitly narrowed or constructively amended the indictment, we are not persuaded. In any event, such amendment might raise its own concerns. The law recognizes constructive amendment of an indictment to broaden a defendant's criminal exposure as a "serious error." *Unit-*

*ed States v. Ansaldi*, 372 F.3d 118, 126 (2d Cir.2004). In general, a constructive amendment narrowing the scope of an indictment is not troublesome because it does not similarly increase a defendant's criminal exposure. *See United States v. Miller*, 471 U.S. 130, 144, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (rejecting proposition that "it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to

The government does not, however, rely only on the plea allocution. It submits that the record of Olmeda's sentencing further supports construing the North Carolina indictment as limited to the Fayetteville seizure. Specifically, it notes that North Carolina prosecutors, in urging a higher Sentencing Guidelines offense level than settled on by the court and a sentence at the high end of the Guidelines range, referenced the particulars of Olmeda's Fayetteville seizure with no mention of the Manhattan seizure. The government submits that this omission would have been anomalous unless it was clear to the parties that the Manhattan seizure was not included within the North Carolina charge. We are not persuaded.

As explained above, our double jeopardy inquiry focuses on how a reasonable person familiar with the totality of the facts and circumstances would interpret the first indictment at the time jeopardy attached, which in this case was when Olmeda pleaded guilty, *see United States v. Aliotta*, 199 F.3d at 83, not when he was sentenced. We are mindful that government and defense counsel emphasize or omit facts from sentencing arguments for any number of reasons. Sentencing arguments are relevant to double jeopardy analysis only insofar as they assist an objective observer in clarifying any ambiguities in the scope of the indictment at the time jeopardy in fact attached. If, for example, a prosecutor at sentencing were to state that the parties had never understood the indictment to charge, or the defendant's guilty plea to admit, certain conduct, and if the defendant were then to affirm that understanding, that evidence, developed at sentencing but reflective of the parties' common understanding at the time of the plea, would properly factor into an objective assessment of the scope of the indictment at the time jeopardy attached. In the case before us, however, there would be no reason for an objective observer to conclude that the government's brief comments at sentencing constituted a complete characterization of the prosecutor's understanding of the charges or of a tacit understanding between the parties as to the meaning of the North Carolina indictment. Certainly, Olmeda does not concede that he understood from the government's failure to reference the Manhattan ammunition seizure at sentencing that he was still subject to prosecution for that conduct.

We note that Olmeda's North Carolina Pre–Sentence Report ("PSR") also omits any reference to the Manhattan ammunition possession. The government submits that the omission supports its argument that the parties never intended for this conduct to be included within Olmeda's guilty plea to the North Carolina indictment. Here too, we are not convinced. At the outset, we do not foreclose the possibility that in some cases PSRs may be relevant to double jeopardy analysis. Such reports are, after all, based in part on interviews with the parties. Further, the parties are afforded the opportunity to object to their contents. In this case, however, the import of the PSR's failure to reference the Manhattan ammunition seizure and Olmeda's failure to object thereto is itself too ambiguous to assist an objective arbiter in clarifying any ambiguity in

an offense that is clearly contained within it"); *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003) ("Where charges are constructively narrowed or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." (internal quota-tion marks omitted)). But where the government constructively narrows an indictment after jeopardy attaches only to refile the dropped charge at a later date, a variation on the problem of increased exposure arises implicating due process if not double jeopardy concerns.

the scope of the North Carolina indictment's reference to "elsewhere" that may have existed.

First, there is no satisfactory explanation for the omission of Olmeda's New York possession from his North Carolina PSR. Whether or not the New York ammunition possession was part of the North Carolina crime of conviction, the sentencing judge was entitled to know about this similar conduct in fashioning an appropriate sentence. *See Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (stressing importance that sentencing judges have "the fullest information possible concerning the defendant's life and characteristics"); *United States v. Fell,* 360 F.3d 135, 143–44 (2d Cir.2004) (same); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence."). Thus, the omission of the Manhattan seizure from the PSR is inexplicable regardless of its double jeopardy implications, and, for that reason, cannot convincingly support the government's argument that an objective arbiter would simply ignore the seizure in construing the North Carolina indictment's reference to "elsewhere."

Second, the omission of the New York possession from the PSR and the failure of either party to object to that omission had no impact on Olmeda's sentence. If the omission of the Manhattan seizure from the PSR had resulted in Olmeda being sentenced pursuant to a lower Guidelines range than would have otherwise applied, it might provide an objective observer with some basis for questioning the inclusion of the New York conduct in the indictment to which Olmeda pleaded guilty. In such circumstances, an objective observer might

expect the government to object to the Guidelines calculation or Olmeda's counsel to clarify his client's understanding that his plea covered the Manhattan seizure. But, as the district court correctly observed, inclusion of the Manhattan ammunition in Olmeda's Guidelines calculations would not have altered his sentencing range. *See* U.S.S.G. § 2K2.1; *see also supra* at n. 6. Indeed, because the district court sentenced Olmeda to the high end of that Guidelines range and because the government did not seek an upward departure, there is no reason to think that the PSR's omission of the Manhattan seizure materially affected the district court's sentencing decision or that the parties' failure to object to the omission was necessarily probative of their understanding of the scope of the North Carolina indictment at the time of Olmeda's guilty plea.

In sum, the sentencing proceedings, whether considered in isolation or together with the plea proceedings, are insufficient to establish by a preponderance of the evidence that a reasonable person, familiar with the totality of the facts and circumstances, would *not* construe the "and elsewhere" language of the North Carolina indictment, at the time of Olmeda's guilty plea, to reference his only other known June 2002 ammunition possession, that in Manhattan. Accordingly, because the government has failed to carry its burden at this second stage of the double jeopardy inquiry, we necessarily conclude that the Southern District indictment in this case is barred by Olmeda's earlier guilty plea to the North Carolina indictment and must, therefore, be dismissed.

## III. *Conclusion*

To summarize, we conclude that

(1) Olmeda's June 2002 conduct could have supported ammunition possession prosecutions in both the Eastern District

of North Carolina and the Southern District of New York for separate possessions of ammunition in violation of 18 U.S.C. § 922(g);

(2) nevertheless, Olmeda could have been charged, without prejudice to him, in a duplicitous indictment in the Eastern District of North Carolina that included his June 2002 ammunition possessions both in that district and in Manhattan thereby foreclosing the challenged Southern District indictment;

(3) to determine whether two offenses charged in successive prosecutions are the same in fact, a court must apply a burden-shifting test:

(a) the initial burden is on the defendant to make a colorable objective showing that a reasonable person familiar with the totality of the facts and circumstances would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense charged in the subsequent prosecution; and

(b) if the defendant makes that showing, the burden shifts to the government to demonstrate, by a preponderance of the evidence, that a reasonable person familiar with the totality of the facts and circumstances would not, in fact, construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense charged in the subsequent prosecution; and

(4) the North Carolina indictment's pleading of ammunition possession in the "Eastern District of North Carolina *and elsewhere*" is reasonably construed to reference both the North Carolina and New York June 2002 ammunition possessions given that, (a) at the time of presentment, North Carolina prosecutors knew of Olmeda's contemporaneous possession of ammu-

nition in his New York apartment, had no reason to think that he possessed ammunition anywhere other than in North Carolina and New York, and had no good faith basis for thinking that Olmeda ever possessed the ammunition seized from him in Fayetteville "elsewhere" than in the charging district; and (b) the government fails to point to a preponderance of evidence warranting a narrower construction of the North Carolina indictment.

Accordingly, because we conclude that, upon Olmeda's guilty plea to the North Carolina indictment, jeopardy attached to both his North Carolina and New York June 2002 ammunition possessions, we hold that double jeopardy bars Olmeda's pending prosecution in the Southern District of New York for the latter possession. We hereby REVERSE the contrary ruling of the district court and REMAND with directions that it dismiss the Southern District indictment.